## Kruchten v Eastman Kodak Co.

2023 NY Slip Op 34556(U)

December 29, 2023

Supreme Court, New York County

Docket Number: Index No. 656302/2020

Judge: Joel M. Cohen

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. JOEL M. COHEN**

*Justice*

-------------------------------------------------------------------------------------X

BRAD KRUCHTEN,

PART _____03M_____

                             Plaintiff,

INDEX NO. _____656302/2020_____

              - v -

EASTMAN KODAK COMPANY, COMPUTERSHARE INC.,
COMPUTERSHARE TRUST COMPANY, N.A.

                          Defendants.

-------------------------------------------------------------------------------------X

## DECISION AFTER NON-JURY TRIAL

This is a dispute between a retired corporate executive (Plaintiff Brad Kruchten) and the company he served with distinction for more than 35 years (Defendant Eastman Kodak). It involves a botched attempt to exercise stock options, a seemingly straightforward task that was confounded by corporate errors.

In a nutshell, Mr. Kruchten sought to capitalize on a significant – though as it turned out fleeting – uptick in Kodak's stock price in July 2020 to exercise stock options that had long been under water (*i.e.*, the option exercise price had been higher than Kodak's stock price). He contacted Kodak's agent Defendant Computershare, Inc., to whom he had specifically been directed by Kodak, to exercise all of his available options. During the course of a lengthy telephone call, Mr. Kruchten was repeatedly told by Computershare (and by extension Kodak) that he had 21,978 options available for exercise and that all of his other options had been terminated or had expired. Although Mr. Kruchten politely pushed back that the number of options appeared to be low (given his seniority at the company), the Computershare

representative held firm that the corporate records were clear on the point. Ultimately, he accepted Computershare's representation and exercised the 21,978 options.

Unfortunately, the representations made by Computershare (and by extension Kodak) during that call were inaccurate. In fact, because of a mistake made by Kodak and Computershare employees shortly after Mr. Kruchten retired in 2018, Computershare (and Kodak) had it exactly backwards. As it turned out, the 21,978 options he was told he *could* exercise in 2020 were unvested and should have been cancelled upon retirement, while the lion's share of his options (exercisable for 125,695 shares) became fully vested upon retirement and *should have been* available for exercise in 2020. If he had been provided accurate information, Mr. Kruchten would have been entitled to a pre-tax payment of over $1.6 million for exercising the 125,695 options, rather than the pre-tax amount of about $386,000 he in fact was credited for exercising the 21,978 options. By the time these facts came to light, however, and as Kodak began unraveling a large number of other mistakes in connection with its options program, Kodak's stock price had dropped below the option exercise price and Mr. Kruchten's vested options were, again, under water and without value.

In this action, Plaintiff asserts breach of contract claims against Kodak and Computershare as well as a negligence claim against Computershare.[1] After a two-day non-jury trial, the Court finds that Kodak breached its contractual obligations to Mr. Kruchten under the company's Omnibus Plan and Award Agreements by failing to exercise the options he was

---

[1] Kodak and Computershare entered into a Confidential Settlement, Defense, Indemnification and Release Agreement in connection with this action on August 18, 2021(PX-41 - redacted). That agreement apparently resolved any differences between the entities and presumably allocated responsibility for the costs of defense and liability vis-à-vis Mr. Kruchten, though the details are not in the record. The same counsel appeared at trial for both Kodak and Computershare.

entitled to (and sought to) exercise on July 30, 2020. Although the Court finds Computershare not to be liable for breach of contract because it had no contractual relationship with Mr. Kruchten, it finds that Computershare owed a duty of care to Mr. Kruchten despite the parties' lack of privity and that it is liable in negligence for its role in the inaccurate recording of Mr. Kruchten's options and for conveying inaccurate information to Mr. Kruchten in connection with the exercise of his options. The Court finds Defendants jointly and severally liable to Mr. Kruchten in the total amount of $1,293,916.88 (after applying a set off for the amount Mr. Kruchten was credited for the options he was permitted to exercise) plus prejudgment interest.

## FINDINGS OF FACT

The Court makes the following findings of fact based on its review of the evidence admitted at trial (June 20-21, 2023), including its evaluation of the credibility of the witnesses who testified during the proceedings, and post-trial briefs submitted by counsel on July 7, 2023 and July 21, 2023.

1. Plaintiff began his career at Kodak in 1982 as a quality engineer before becoming a corporate officer in 2002 (Tr. 135:2-3; 135:11-13). He was described as a "fantastic executive" who helped lead business units of Kodak making up sixty-five percent of Kodak's revenue (Tr. 115:16-116:4; 139:10-22; 141:9-11; 141:20-142:2).

2. As relevant here, Plaintiff entered into an employment agreement dated July 30, 2013, effective upon Kodak's emergence from bankruptcy (the "Employment Agreement") (NYSCEF 156 ¶ 1; Tr. 144:16-19). Pursuant to the Employment Agreement, Plaintiff was eligible to participate in the Company's Long Term Incentive Plan under the Kodak 2013 Omnibus Incentive Plan (the "Omnibus Plan") (NYSCEF 156 ¶ 2). Kodak

[* 3]

established the Omnibus Plan after it emerged from bankruptcy in 2013 for the purpose of attracting, retaining, and motivating officers and employees by providing them with stock-based compensation (*id*. ¶ 3; PX 1 § 1.2).

3. Pursuant to § 6.1 of the Omnibus Plan, Kodak documented its awarding of stock options to Plaintiff in "Award Agreements" that set out the number of options, their strike price, and their vesting dates (NYSCEF 156 ¶ 4; PX 1 §6.1). The Omnibus Plan also set forth and governed Kodak's obligations relating to the stock-based compensation provided to participants such as Plaintiff (*see* Tr. 233:24-234:2).

4. Plaintiff received four awards of non-qualified stock options ("NQSOs") and four awards of restricted stock units ("RSUs") (NYSCEF 156 ¶ 5; *see also* PX 2-5). The Award Agreements contained a vesting schedule for both the NSQOs and RSUs awarded to Plaintiff and identified separate strike prices at which Plaintiff could exercise his vested options (PX 2-5; NYSCEF 156 ¶ 5).

5. The Omnibus Plan specified how Plaintiff could exercise his options (PX 1 § 6.4).

<u>Kodak's Contract with Computershare:</u>

6. Computershare served as Kodak's administrative agent with respect to the Omnibus Plan and performed stock plan administrative services for Kodak and Omnibus Plan Participants (NYSCEF 156 ¶ 8). Upon entering into the agreement with Kodak, Computershare emailed all participants in the Omnibus Plan with instructions prompting them to set up an online account (Tr. 237:2-11; *see also* Tr. 202:18-203:70). Part of Computershare's role as administrative agent included maintaining accounts for each participant in the Omnibus Plan, including Plaintiff, that reflect the various forms of stock-based compensation awarded to them (Tr. 237:2-11).

[* 4]

7. For example, under the Agency Services Agreement which governed Computershare's relationship with Kodak, Computershare agreed to host Kodak's recordkeeping system; record activity in accounts and perform reconciliation services with respect to vesting and exercises of options; provide participants access to a website which enabled participants to view grant status, details, request a statement, and submit option exercise requests; provide participants with access to customer service representatives; determine the number of shares that have been exercised; vest and lapse grants as designated by the Omnibus Plan; process forfeitures and cancellation of stock options; provide brokerage facility to simultaneously exercise and sell stock options; and track and report shares available under the plan (PX 6 at 39-43).

8. Computershare was also required to "take commercially reasonable steps to deliver monthly reports on time" for stock options, and to "research and correct any out of balance condition identified" (*id*. at 46-47).

9. Prior to her retirement in 2018, Karen Kelly served as Kodak's Director of Total Rewards and Operational Excellence and was responsible for global compensation and benefits, and other operations such as administration of payroll (Tr. 231:7-17). As such, she was familiar with the Omnibus Plan and any policy she implemented had to be in accordance with the Omnibus Plan (Tr. 233:15-25; 234:1-2). Upon rejoining Kodak in April of 2019, Kelly was responsible for executive compensation (Tr. 232:17-21).

10. Kelly primarily worked with Kim Zampatori ("Zampatori"), who served as Benefits Manager for Kodak (Tr. 236:21-23). Zampatori had the ability to make entries into Computershare's online system and would request assistance from Computershare employees on occasion (Tr. 12:7-14).

11. Anthony Marrone ("Marrone") was a Computershare account manager whose responsibilities included managing domestic and foreign international equity compensation plans (Tr. 27:3-10). According to Marrone, Kodak was not "up to par" or "fully versed" in Computershare's system during his time working with the company from 2014 to 2021 (Tr. 65:5-23).

Plaintiff's Retirement and Kodak's Mistaken Cancellation of Options:

12. As of the last day of his employment on April 24, 2018, Plaintiff held the following Kodak options (NYSCEF 156 ¶ 7):

| Date | Award Agreement | CS Grant ID | Vested Options | Strike Price |
|------|-----------------|-------------|----------------|--------------|
| 9/3/2014 | First Award Agreement | 48 | 53,232 (100% vested) | $23.78 |
| 9/3/2015 | Second Award Agreement | 217 | 48,694 (2/3 vested) | $13.76 |
| 9/3/2016 | Third Award Agreement | 462 | 23,769 (1/3 vested) | $15.58 |
| 11/15/2016 | Fourth Award Agreement | 490 | 0 (none vested) | $15.20 |
| | **Total Vested Option Rights** | | **125,695** | |

13. On the day of his retirement, Plaintiff was given a document from Kodak's Human Resources Director stating that Kodak was going to accelerate some of his equity (Tr. 186:22-187:3; 260:24-261:7). Though he was generally aware that he had been awarded about 250,000 vested and unvested NSQOs during his post-bankruptcy employment at Kodak and that some would be forfeited due to his retirement, Plaintiff did not know exactly how many of his NSQOs had vested or how many had been forfeited (Tr. 189:17-23; 198:23-199:8; 200:3-5).

[* 6]

14. On April 18, 2018, Zampatori emailed Marrone informing him that Plaintiff was retiring and (mistakenly) that he would be forfeiting "all of his outstanding shares, except [that] he has accelerated vesting on the 1st tranche of [the Fourth Award Agreement] grant," and asked Marrone to walk her through that entry because she did not know how to do that and wanted to "make sure everything goes smoothly" (PX 18; Tr. 13:9-22).

15. As a result of a series of communications culminating in a phone call between Zampatori and Marrone on April 25, 2018, Computershare incorrectly cancelled all but 21,978 of Plaintiff's stock options, which represented the amount of stock options awarded to Plaintiff in the first tranche of the Fourth Award Agreement (PX 41 at 3), which was unvested and should have been cancelled.

16. Kodak had no procedure in place at the time to ensure that its records of a participant's vested options matched Computershare's records (NYSCEF 156 ¶¶ 9-10). Moreover, the Award Agreements do not contain any provisions allowing for the cancellation of vested NSQOs (see PX 2-5).

17. Neither Zampatori nor Marrone recalled the details of their phone call, but Marrone testified that he "went off the phone conversation" when he performed the actions in Plaintiff's account and that the instructions received on the phone differed than those given in the emails (Tr. 48:16-19; 68:8-15).

18. The August 18, 2021 Kodak/Computershare settlement agreement (PX-41) contains a recitation of the facts regarding Mr. Kruchten's options. Among other things, this document (drafted by the Defendants), states the following:

   a. "WHEREAS, as of April 24, 2018, Mr. Kruchten possessed a total of 125,695 vested Kodak stock options at the strike prices listed above;

b.    WHEREAS, on April 18, 2018, Kodak advised Computershare that Mr. Kruchten would be retiring on April 24, 2018 and would be forfeiting all of his outstanding shares, and requested Computershare's assistance in cancelling all of Mr. Kruchten's outstanding shares in Mr. Kruchten's account administered by Computershare;

c.    WHEREAS, Kodak and Computershare agreed to speak on April 25, 2018 to effectuate this change to Mr. Kruchten's account;

d.    WHEREAS, on April 25, 2018, Kodak requested Computershare's assistance to terminate Mr. Kruchten in Computershare's system and to assist Kodak to have all of Mr. Kruchten's unvested share forfeited with the exception of the 1st tranche of the November 15, 2016 award granted to Mr. Kruchten which would be subject to accelerate vesting;

e.    WHEREAS, on April 25, 2018, Kodak and Computershare discussed the cancellation of Mr. Kruchten's stock options but have different recollections as to whether Kodak instructed Computershare to cancel all of Mr. Kruchten's Kodak stock options or only his unvested Kodak stock options, with the exception of the first tranche of the November 15, 2016 grant;

f.    WHEREAS, during its April 25, 2018 telephone call with Kodak, Computershare cancelled all but 21,975 [sic] of Mr. Kruchten's stock options, which represented the amount of stock options that Kodak awarded Mr. Kruchten in the first tranche of the November 15, 2016 grant;

g.    WHEREAS, on April 25, 2018, Kodak sent Computershare an e-mail that states in pertinent part "[y]ou are not going to believe this, but Brad Kruchten is NOT

receiving accelerated vesting on that November 15, 2016. He is forfeiting those shares. I am happy to fix the record. Can we pull the job that runs the vesting? ...;"

h.   WHEREAS, on April 25, 2018, Computershare sent Kodak an e-mail that states in pertinent part "[n]o worries at all! We deleted the pending and cancelled the 9210 that was outstanding on the RSU;"

i.   WHEREAS, on July 30, 2020, Mr. Kruchten called Computershare, asked Computershare how many Kodak stock options were in his account, was told that he had 21,978 options, and asked Computershare to make a cashless exercise of his 21,978 options;

j.   WHEREAS, according to Kodak, as a result of his cashless exercise of his 21,978 options, Mr. Kruchten incurred $386,593.02 of taxable income, and received gross proceeds of $356,850.00 before deducting federal or state taxes or withholdings;

19. The Kodak/Computershare settlement agreement does not, perhaps for strategic reasons, assign specific blame for the errors in Mr. Kruchten's account, but does confirm a number of the basic facts, the most salient of which is that Mr. Kruchten's account post-retirement should have reflected that he had 125,695 exercisable options but instead – due to errors made collectively by Kodak and Computershare at the time of his retirement – showed that he had only 21,978.

20. In 2019, Kodak sent Plaintiff a questionnaire for purposes of Kodak's upcoming 10-K and Proxy Statement (PX 9 at 3). After correcting for an incorrect file, Kodak then sent Plaintiff information regarding his stock options which appeared to reflect that all of Plaintiff's stock options from the four Award Agreements remained (Tr. 15:3-11; PX 9 at

[* 9]

1). Upon receiving this, it was unclear to Plaintiff whether the information provided referred to vested or unvested stock options (Tr. 195:12-14; 196:11-14). However, the information provided was inconsistent with Computershare's account, which reflected Plaintiff held only 21,978 stock options.

21. After submitting this questionnaire, Plaintiff did not receive any other information regarding his stock options until July 30, 2020 (Tr. 151:3-7).

Plaintiff's Exercise of the Options:

22. Before 2020, all of Plaintiff's vested NSQOs were "under water," i.e., the market price for Kodak's stock did not exceed the strike price for the options (NYSCEF 156 ¶ 7; Tr. 159:9-15; 190:5-191:6; PX 16). The NSQOs only had value to Plaintiff when the market price of Kodak stock exceeded the strike price (Tr. 190:21-191:6).

23. On July 28, 2020, after an announcement concerning a potential loan to be made by the U.S. International Development Finance Corporation to Kodak, Kodak's stock price increased and fluctuated over the course of the next few days (NYSCEF 156 ¶ 11; PX 16).

24. Plaintiff tracked Kodak's rising stock price and on July 29, 2020 sold all shares of Kodak he received when his RSUs had vested (Tr. 157:11-158:3).

25. Plaintiff did not think about exercising his NSQOs until he received a telephone call on July 30, 2020, from a former Kodak executive who asked whether Plaintiff had exercised those options (Tr. 200:19-201:12). At that time Plaintiff was driving his RV en route to a vacation (Tr. 158:16-20). On their phone call, the former executive told Plaintiff to call Computershare to exercise his options and gave him what turned out to be an incorrect phone number (Tr. 160:15-17).

26. Plaintiff contacted Karen Kelly who provided Plaintiff with a different number and told Plaintiff to call Computershare to exercise his options (Tr. 161:19-26; 162:2-6).

27. Plaintiff called the number provided by Kelly and he and his wife, Dolores Kruchten ("Dolores"), spoke with an authorized Computershare representative (Tr. 162:2-12; NYSCEF 156 ¶ 12; *see* DX A). The Kruchtens could not exercise their options by contacting Kodak directly – they could only exercise the option through Computershare (DX A at 2:5-9; Tr. 83:1-9).

28. Section 6.4 of the Omnibus Plan, which governs the procedure through which participants could exercise options, states, "an Option may be exercised for all, or from time to time any part, of the Shares for which it is then exercisable" and that "the exercise date of an option shall be the later of the date a notice of exercise is received by the Company and, if applicable, the date payment s received by [Kodak]" (*id.*). Section 6.4 also permitted participants to exercise their options "under a cashless exercise program" which required no upfront payment of the strike price to exercise an option (*id.*; Tr. 242:1-3).

29. Although Plaintiff actually held 125,695 vested NSQOs, his Computershare account was inaccurate and contained only 21,978 NSQOs (NYSCEF 156 ¶ 14). That number represented an improper cancellation of his vested options and an inaccurate accelerated vesting of one-third of Plaintiff's options from the Fourth Award Agreement (PX 26).

30. After some confusion between Dolores, Plaintiff, and the Computershare representative with whom they spoke on the phone, the Computershare representative instructed them that they needed to create an online account on Computershare's system and certify their

tax ID number to avoid a withholding of an additional percentage from the proceeds (*see* DX A at 4:14-5:25).

31. During the phone call, Plaintiff mistakenly was told that "65,935 [options were] granted. Outstanding is 21,978 remaining. What was canceled, 43,957. So that's it. You're not going to get any more. That's it. Once you sell that, that's it" (DX A at 17:9-12). Meanwhile, Dolores was told she had 67,680 options she could exercise (*id*. at 8:19-9:7).

32. Plaintiff expressed confusion at this information, stating that it "seems really low for me" and that he "should have more than [Dolores] has" (*id*. at 17:16-20; 15:16; 14:22-23), given his seniority and tenure. As a result of this confusion, Plaintiff asked "how many can we actually sell now?" To which, Computershare's representative confidently replied, again, "21,978. That's it. That's all you're going to have. That's it. After you sell this, you're done – that's done" (*id*. at 17:16-20).

33. Throughout the phone call, the Computershare representative expressed certainty about Plaintiff's holdings and made no suggestion that the information provided may be inaccurate or incomplete (*see id*.). Nor did the Computershare representative suggest Plaintiff speak with someone at Kodak to explore any potential issues with his account (Tr. 165:12-15). In fact, the Computershare representative confirmed that number as a result of the April 25, 2018 cancellation (DX A at 15:17-23). As described above, this representation was inaccurate and significantly understated Plaintiff's actual balance by approximately 104,000 stock options (NYSCEF 156 ¶¶ 7, 14).

34. Although still confused by the information provided, the unfailingly polite Mr. Kruchten accepted the information provided by Computershare as correct and informed the Computershare representative that he wanted to exercise his stock options using the

[* 12]

cashless method (Tr. 205:25-206:2; DX A at 24:15-22). Computershare's representative then asked Plaintiff confirm whether he wanted to exercise the 21,978 options or a portion (*id*. at 25:7-8). Plaintiff responded, "All of it." (*id*. at 25:9). This order was then confirmed once more by Computershare's representative (*id*. at 26:17-22).

35. At trial, Defendants' counsel questioned Mr. Kruchten regarding his confirmation to exercise 21,978 options (Tr. at 211-13):

Q: So when she asked you, "You want to exercise 21,978 or a portion?" You said, All of it." Right?

A: Correct.

Q: Meaning 21,978 options?

A: I wanted all of it, that's what I responded.

Q: She was giving you the option of 21,978 or some portion thereof, right?

A: Yes.

Q: And you said, all, meaning the maximum, 21,978?

A: I don't – I said, "All of it." I don't know what I was meaning at that time." That's – I said, "All of it."

Q: Right, meaning 21,978, right?

A: I wanted all my options sold.

Q: Did you say to her – where was it in here that you said to her, well, I want to exercise more than 21,978 options?

A: I said, "All of it." I don't know what else –

Q: Where in this conversation did you tell the Computershare representative that you wanted to exercise more than 21,978 options?

A: During the conversation, I said, it seemed low and I thought that it would be more. But she told me that there wasn't any more.

Q: Right. And you never asked her to exercise any more?

A: I couldn't.

36. On re-direct, Mr. Kruchten testified, credibly, that if he had been told by Computershare that he could exercise a larger number of options, his answer ("All of it") would have been the same (Tr. at 223).

37. The Court finds, based on the recording of the telephone conversation and the testimony offered at trial, that if Plaintiff had been told by the Computershare representative that 125,695 options (rather than just 21,978) were available for exercise, he would have provided the same answer: All of it. This conclusion is bolstered by the fact that Mr. Kruchten had already cashed out all of his owned shares, and plainly was seeking to take full advantage of the fact that, after many years, his options actually had value.

38. In sum, the Court finds that by a preponderance of the evidence but for the mistakes made by Kodak and Computershare at the time of Mr. Kruchten's retirement, and but for the inaccurate information provided by Computershare when Mr. Kruchten sought to exercise his options in 2020, Mr. Kruchten would have exercised all 125,695 of his exercisable options on July 30, 2020.

39. In completion of the transaction, Computershare sent the transaction to a broker, who purchased the 21,978 shares of Kodak stock at a strike price of $15.20 and sold the stock as a price of $31.49 per share (PX 13). The net proceeds to Plaintiff from this exercise amounted to $358,023.82 (*id*.). The gross proceeds were $692,089.42 (*id*.).

40. The evidence at trial supports the conclusion that even if Plaintiff had said he wanted to exercise 125,695 options on the July 30, 2020 phone call, Computershare would not have exercised them if they were not displaying in his account (Tr. 280:15-20). Instead,

[* 14]

Computershare would have told Plaintiff how many options were available to him according to their records, asked if he would like to exercise any amount of those, and would not have done anything else (Tr. 279:17-280:20).

41. On July 30, 2020, at the time of Plaintiff's exercise Kodak stock traded at a value of $31.49 per share (PX 13).

42. On the same day, Dolores opened an online Computershare account based on the same telephone conversation with the Computershare representative (DX A 28:23-31:12). However, Dolores initially exercised her options online and mistakenly elected to perform a cash exercise, which required her to tender payment of the strike price before her shares could be purchased and sold, rather than the cashless exercise (Tr. 217:10-24; 164:19-165:1).

43. Upon realizing her mistake, Dolores called Computershare back and was directed to contact Kodak to address the issue (DX B 28:12-29:5). Dolores called Karen Kelly that afternoon and asked for her help to correct it, who was ultimately able to reverse the error and complete Dolores' transaction on July 31, 2020 (Tr. 217:15-218:19; 241:9-242:3; DX B 29:10-30:11).

44. Plaintiff did not inquire into the status of his NQSOs until August 7, 2020, when he emailed Karen Kelly to understand the discrepancy in his and Dolores' accounts (NYSCEF 156 ¶ 16; Tr. 165:16-166:21; 192:11-15; 219:9-20; 254:13-255:3; PX 14, 16).

45. Kelly responded on August 10, 2020 indicating there was "an issue at Computershare with the number of options you should have available to exercise" and that she was "working now to get [it] fixed and will notify [Plaintiff] of [the] status and outcome" (PX 14; PX 33).

[* 15]

46. Plaintiff next spoke to Kelly in a phone call on August 13, 2020 wherein Kelly informed Plaintiff that he should have had more options available to exercise on the July 30, 2020 phone call and what the total value would have been on that day (Tr. 167:5-168:18; 255:8-11).

47. Plaintiff emailed Kelly on August 21, 2020 seeking an update (PX 33). Kelly replied that she was "waiting for steps to correct from outside counsel" (*id*.).

48. While Kelly had raised the issue with Computershare on August 11, 2020, Plaintiff's options were not reinstated until October 12, 2020 (Tr. 107:25-108:22).

49. At trial, Kelly testified that had Plaintiff's options "been of value, [she] would have fixed them immediately" but because they were "under water" it was not "the highest priority at the time" (Tr. 275:4-14). This testimony conflicts with her August 21, 2020 email to Plaintiff wherein she stated that she "was waiting for steps to correct from outside counsel" (PX 33).

50. While Kelly testified generally that she would have corrected the error immediately, or on the "same day," if she had been made aware (Tr. 254:11-12), Defendants offered no detail as to how this would have been accomplished other than Kelly's testimony that she would have "analyze[d] the account, determine[d] what happened, and ask[ed] Computershare to correct the error" (Tr. 254:9-10). The Court found this speculation, while well-meaning and genuine, to be unpersuasive.

Kodak's Investigation into the Errors:

51. After experiencing numerous issues with equity accounts in July 2020, Kelly began having daily contact with Computershare (Tr. 266:3-11). Specifically, Kelly contacted Computershare's relationship manager for Kodak, Trudy Naimy ("Naimy") to investigate

[* 16]

and make corrections to Plaintiff's account (PX 23; Tr. 267:4-7; 17-13; 268-24). Those corrections merely corrected erroneous expiration dates for the first award (PX 24; Tr. 267:8-268:13).

52. Naimy then contacted Marrone to inquire about Plaintiff's cancellations (PX 22). Marrone told Naimy that he had emails from Zampatori "asking [him] to call her and assist with the termination and forfeitures. As you know Kodak is not self-sufficient, so I obviously touched the records" (PX 29). Naimy forwarded this email to Kelly informing her it looked like Marrone "did what was requested" (PX 30).

53. Around the same time, Kodak began an internal review with respect to its stock plan administration and performed an audit (Tr. 166:11-24). Between August and November 2020, Kodak performed the audit and issued a written report (the "Audit Report") (NYSCEF 156 ¶ 17).

54. The Audit Report revealed a "[p]ervasive lack of adequate controls to safeguard company assets," including "numerous errors and misstatements to individual equity accounts which had not been detected and/or corrected in a timely fashion" (PX 15). Though these pervasive issues led, in many instances, to Kodak overstating the amount of exercisable options employees had, it also mentioned issues such as Plaintiff's which led to understating the amount of exercisable options.

55. The Audit Report specifically referenced Plaintiff's case, stating there was an "individual [who] requested all their options be exercised without knowing their account balance was understated by a net of 104,000 options" (*id.* at 3). Kodak likewise referred to Plaintiff's problem in a public filing with the SEC referring to "five former officers and employees" who exercised "previously forfeited" and "unauthorized" NSQOs (PX 36 at 53),

[* 17]

inaccurately suggesting that Mr. Kruchten obtained a net benefit from Kodak's internal errors, when in fact the opposite was true.

56. Based on the evidence presented at trial, the Court finds that Computershare (and Kodak) acted negligently with respect to the recording of Plaintiff's exercisable options upon his retirement, and that this negligence proximately caused Plaintiff's loss of the opportunity to fully exercise his options. The Court further finds that Plaintiff was not negligent in any respect with respect to this transaction.

57. On August 18, 2021, Kodak and Computershare entered into a settlement agreement wherein Kodak assumed Computershare's defense of this action (PX-41; NYSCEF 156 ¶ 18).

## CONCLUSIONS OF LAW[2]

### A. BREACH OF CONTRACT AGAINST KODAK

Plaintiff's first cause of action alleges a breach of contract against Kodak for its failure to issue the 125,695 vested NQSOs to Plaintiff under the terms of the Award Agreements and the Omnibus Plan when Plaintiff exercised the options on the July 30, 2020 phone call with Computershare (*see* NYSCEF 2 ¶¶ 51-57). It is well settled that to establish a breach of contract, Plaintiff must prove the (1) the existence of a valid contract; (2) his performance of his

---

[2] In his complaint, Plaintiff asserts a cause of action against Computershare for Breach of Contract – Third Party Beneficiary and for Transfer Agent Liability under UCC §8-407 (NYSCEF 2 ¶¶ 63-68; 72-74). However, Plaintiff does not provide any discussion or argument on these causes of action in his post-trial papers (*see* NYSCEF 167, 169). In light of Plaintiff's failure to seek this relief in his post-trial memoranda, these claims are dismissed (*see LeVigne v Levigne*, 220 AD2d 561, 562 [2d Dept 1995] [affirming trial court decision declining to include specific form of relief in judgment where plaintiff failed to request relief during trial or in post-trial memorandum]).

obligations thereunder; (3) Defendants' breach of their obligations; and (4) resulting damages (*see Morris v 702 E. Fifth St. HDFC*, 46 AD3d 478, 479 [1st Dept 2007]).

Here, there is no dispute that the Award Agreements and the Omnibus Plan constitute valid and binding contracts between Plaintiff and Kodak (*see* NYSCEF 156). Further the Omnibus Plan documents Kodak's award of options to Plaintiff in the Award Agreements that set out the number of options Plaintiff was to receive, their vesting dates, and their respective strike prices (*id.* ¶ 4). "An option contract is an agreement to hold an offer open; it confers upon the optionee, for consideration paid, the right to purchase at a later date" (*Kaplan v Lippman*, 75 NY2d 320, 324 [1990] [internal quotations omitted]). "The optionee must exercise the option in accordance with its terms within the time and in the manner specified in the option" (*id.* at 325). Thus, "[o]nce the optionee gives notice of his intent to exercise the option in accordance with the agreement, the unilateral option agreement ripens into a fully enforceable bilateral contract" (*id.*).

Section 6.4 of the Omnibus Plan governed the manner in which Plaintiff was to exercise his options. Specifically, it states "an Option may be exercised for all, or from time to time any part, of the Shares for which it is then exercisable" and that "the exercise date of an Option shall be the later of the date a notice of exercise is received by [Kodak] and, if applicable, the date payment is received by [Kodak] pursuant to [the methods prescribed below]" (PX 1 §6.4). One of those prescribed methods permits Plaintiff to exercise his options "under a cashless exercise program (whether through a broker or otherwise) implemented by [Kodak] in connection with the [Omnibus] Plan" (*id.*). Thus, when Plaintiff called Computershare as the authorized representative of Kodak, on July 30, 2020 and stated that he wanted to exercise all of his available options, Kodak received a "notice of exercise" under the Omnibus Plan (PX 1 § 6.4;

[* 19]

DX A; *see also Kirschner v KPMG LLP*, 15 NY3d 446, 466 [2010] ["where conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principal"]).

Kodak's argument that Plaintiff did not provide the required notice *and* payment for the exercise of anything more than 21,978 NQSOs and "thus failed to meet the conditions precedent for exercising 125,695 NQSOs as set forth in the Omnibus Plan" is unpersuasive (NYSCEF 170 at 8). First, Defendant concedes that the cashless exercise under Section 6.4 "for practical purposes, was the equivalent of a cash tender" (*id*. at 10). Accordingly, Plaintiff's election to perform the cashless exercise on the July 30 phone call effectively acted as a simultaneous tender of payment for the options (DX A at 24:15-25:9). Second, Computershare's representative (and by extension Kodak) effectively precluded Plaintiff from any ability to exercise the 125,695 options by repeatedly representing that once Plaintiff sold the 21,978 options, "[t]hat's it. That's all you're going to have. That's it. After you sell this, you're – that's done" (*id*. at 17: 18-20).

Moreover, it is clear from the recording of the telephone conversation and testimony at trial, that Plaintiff intended to exercise all of his NSQOs that day and would have elected to do so if Computershare (and by extension Kodak) accurately accounted for his options. Plaintiff's decision to sell his RSUs a day earlier, as well as Kodak's acknowledgment that Plaintiff "requested all [his] options be exercised" in the Audit Report (PX 36 at 53) further evidence Plaintiff's desire to exercise all of his vested options.

Additionally, Karen Kelly, Kodak's sole witness at trial, testified that Computershare would not have been permitted to exercise all of Plaintiff's options, even if he specifically asked to exercise 125,695 options via the cashless exercise, and would have instead "told [Plaintiff] how many available options [he] had to exercise [based on their miscalculation] and ask for permission on that amount" (Tr. 279:17-280:8).

In essence, Defendants' own actions and policies rendered Plaintiff's ability to comply with their reading of Section 6.4 of the Omnibus Plan impossible. As a result, when Plaintiff directed the Computershare's representative to exercise his options and sell "all of it," Plaintiff gave notice of his intent to exercise his NSQOs in accordance with the Award Agreement and Omnibus Plan (DX A at 25:7-9). Despite Plaintiff's lack of knowledge as to exactly how many vested options he held (*see* Tr. 186:21-187:3), Defendants' improper accounting and resultant inability to execute the cashless exercise for the 125,695 vested options actually owed to Plaintiff resulted in a breach of those agreements (*see Mathias v Jacobs*, 167 F Supp2d 606 [SDNY 2001] [applying New York law]).

In *Mathias*, the plaintiff sought summary judgment arising out of his exercise of stock options after defendant refused to accept it (*id.* at 610). The court granted plaintiff summary judgment finding he "adhered to the performance requirements of the Options Agreements" and rejected defendant's improper tender defense based on plaintiff's miscalculation of how many stock options he held, observing that "New York courts have stated that an exact and unconditional acceptance of an offer is not afterward turned into a conditional acceptance or counteroffer so as to prevent the formation of a contract, by an improper interpretation of the terms of the agreement by one of the parties" (*id.* at 618 [internal quotation omitted]). Likewise here, Plaintiff adhered to the requirements of Section 6.4 of the Omnibus Plan in his exercise of his options on July 30 and "[t]here is no evidence to suggest that [Plaintiff] would not have responded appropriately to a revised computation of the shares to which he was entitled, if [Computershare or Kodak] had appraised him of the error" (*id.*).

*Walsh v Henel*, 226 AD 198 [4th Dept 1929], upon which Defendants rely for the proposition that "[a]n option cannot be exercised by a mere operation of the mind" and must be

specifically communicated to the awarding party, is inapposite (*id*. at 201). *Walsh* concerned a defendant seeking to be released as a surety under a mortgage after a default (*id*. at 198). Noting that the right to accelerate the debt on a mortgage upon default "is in the nature of an option" (*id*. at 198), the court found that the plaintiff did not release the defendant as a surety based upon the fact that plaintiff "never in any way communicated" his intention to "have the whole amount become due" and thus, failed to accelerate debt on the mortgage upon default (*id*. at 199-201). By contrast here, Plaintiff asked to exercise "[a]ll of it" after seeking clarity on how many options he had available to exercise on multiple occasions and being repeatedly told that he only had 21,978 options (*see* DX A generally; 25:7-9).

The other cases Defendants cite for the proposition that an optionee must strictly comply with any conditions precedent set for in the governing agreement are similarly unavailing (*see e.g., Boghosian v SCS Props*., 299 AD3d 693, 696 [3d Dept 2002] [finding that option was not exercised when optionee tendered payment after expiration of deadline established in contract]; *Singh v Atakhanian*, 31 AD3d 425, 427 [2d Dept 2006] [finding plaintiff's attempt to exercise option null and void where plaintiff was in default at time of purported exercise]). While Defendants correctly argue "the optionee must strictly adhere to the terms and conditions of the option agreement" (*Mathias*, 167 Fupp2d at 617), Defendants "ignore[] that this statement of law has been invoked in cases [like those Defendants cite] in which courts have held that the optionee's rights under the contract expired because they violated express terms of the contract, such as those pertaining to the time and method of performance" (*id*. [internal citations omitted]). As stated above, Plaintiff complied with his obligations under Section 6.4 of the Omnibus Plan and there is no evidence to suggest that he would have done anything other than exercise all options vested in his account had he been made aware of Kodak's error (*id*.).

[* 22]

Accordingly, the Court finds that Kodak breached the Award Agreements and Omnibus Plan by failing to issue the 125,695 duly vested NSQOs to Plaintiff under the terms of those agreements.

## B. BREACH OF CONTRACT AGAINST COMPUTERSHARE

Plaintiff's Second Cause of Action appears to assert a breach of contract claim against Computershare arising out of the Plan Terms and Conditions (NYSCEF 2 ¶¶ 58-62). The "Plan Terms and Conditions" is the document governing "Computershare's web services for Plan participants and [was] displayed during first time registration or each time [a participant logged in online]" (PX 34 at 1). Plaintiff argues the Plan Terms and Conditions serve as a supplement to the terms and conditions of the Omnibus Plan and alleges Computershare breached Paragraph 8.1 of the Plan Terms and Conditions by failing to accurately account for Plaintiff's options. (NYSCEF 167 ¶¶ 14, 17). While Paragraph 8.1 states "Computershare will take reasonable care to ensure that information regarding your shareholdings is accurate," it also contains an express disclaimer stating "Computershare does not guarantee the accuracy, completeness, sequence or timeliness of holder account information through this Service, and is not responsible for indirect, consequential, or special damages you may incur through reliance on the information or the accuracy…thereof" (PX 34 at 3).

Even accepting Plaintiff's contention that the Plan Terms and Conditions were a legally binding supplement to the Omnibus Plan, "where [as here] the contract specifically disclaims the existence of any such warranties or representations, an action for breach of contract cannot be maintained" (*Bedowitz v Farrell Dev. Co.*, 289 AD2d 432, 432 [2d Dept 2001] [dismissing breach of contract claim based on oral representations regarding quality of the house in face of express disclaimer] [internal citation omitted]; *see also Costanza Constr. Corp. v Rochester*, 147

[* 23]

AD2d 929, 929 [4th Dept 1989] [affirming dismissal of breach of contract claim where contract "clearly include[d] a disclaimer by the city of any responsibility for the accuracy or completeness of information" concerning the extent of plaintiff's work]).

Further, Plaintiff cannot rely on the first sentence of Paragraph 8.1 without acknowledging the disclaimer that follows (*see e.g., Lobosco v New York Tel. Co./NYNEX*, 96 NY2d 312 [2001]). In *Lobosco*, the Court of Appeals found no breach of contract claim could exist where the plaintiff alleged a "no reprisal" clause in the employee manual created a contractual relationship as opposed to an at-will employment (*id.* at 316). The Court dismissed the complaint "because [of] the explicit disclaimer of a contractual relationship contained" in the employee manual, and held "[a]n employee seeking to rely on a provision arguably creating a promise must also be held to reliance on the disclaimer (*id.* at 316-17). Likewise, here, where Plaintiff seeks to rely on the language contractually obligating Computershare to "take reasonable case" to accurately account for shareholding information, Plaintiff must also be held to the language disclaiming the accuracy, completeness of timeliness of account information (PX 34 at 3).

Accordingly, Plaintiff's Second Cause of Action for Breach of Contract against Computershare fails and is dismissed.

### C. Negligence Against Computershare

In his Fourth Cause of Action, Plaintiff alleges "Computershare owed a duty to use reasonable care to ensure that Plaintiff's options were accurately recorded, and Computershare failed to do so" (NYSCEF 167 ¶ 19; *see also* NYSCEF 2 ¶¶ 69-71). Defendants primarily contest this claim arguing "Computershare had no independent duty to Plaintiff sounding in tort" and that all of "Computershare's obligations relating to the administration of Kodak's stock-incentive

program were governed by contracts" including the Agency Services Agreement (NYSCEF 165 ¶¶ 69, 71). Specifically, with respect to the Agency Services Agreement, Defendants contend that as a non-party, "Plaintiff cannot hold Computershare liable in tort for breaching a provision therein" (NYSCEF 165 ¶ 75).

While "[g]enerally, a nonparty cannot impose tort liability upon a party to a contract for breach thereof" (*Aiello v Burns Intl. Sec. Servs. Corp.*, 110 AD3d 234, 246 [1st Dept 2013]), the Court of Appeals has permitted actions sounding in negligence "despite the absence of a contract between the parties, [where] the plaintiff's intended reliance, on the information *directly transmitted* by [the other party], created a bond so closely approaching privity that it was, in practical effect, virtually indistinguishable therefrom" (*Credit Alliance Corp. v Arthur Andersen & Co.*, 65 NY2d 536, 645-46 [1985] [citing *Glanzer v Shepard*, 233 NY 236 [1922]). Accordingly, Plaintiff's claim that Computershare owed a duty to use reasonable care to ensure that Plaintiff's options were accurately recorded under the Agency Services Agreement, and failed to do so can stand where, as here, "[Plaintiff's] use of [the information provided by Computershare] was not an indirect or collateral consequence of [Computershare's actions]" but rather "was a consequence which to [Computershare's] knowledge, was the end and aim of the [Agency Services Agreement]" (*Glanzer*, 233 NY at 238-239 [1922]).

Specifically, under the Agency Services Agreement, Computershare was engaged to: "[h]ost [Kodak's] system of record for a recordkeeping system to maintain all participant…award data;" "[p]rovide participant's access to the recordkeeping system via a website" which may be used by Participants to, "view grant status," "view grant detail" and "submit option exercise requests;" "provide Participants with access to customer service representatives;" "process forfeitures and cancellations of stock options and restricted awards

based on instructions received from [Kodak] and "determine the number of shares that have been validly exercised" (PX 6 at 39-41). These services "bespoke an affirmative assumption of a duty of care to a specific party, for a specific purpose, regardless of whether there was a contractual relationship" (*Credit Alliance Corp.*, 65 NY2d at 548-49 [citing *Glanzer*, 233 NY 236). Stated differently, Computershare assumed these obligations "with the very end and aim of shaping the conduct of another" (*Glanzer*, 233 NY at 242). As a result, "[d]iligence was owing, not only to him who ordered [i.e., Kodak], but to him who also relied [i.e., Plaintiff]" (*id.*).

The evidence adduced at trial establishes that Computershare negligently failed to accurately record and account for Plaintiff's NSQOs and that Plaintiff detrimentally relied on the "information *directly transmitted* by [Computershare]" (*Credit Alliance Corp.*, 65 NY 2d at 545) when Plaintiff exercised his options on the July 30, 2020 phone call. Accordingly, Computershare breached its duty of care owed to Plaintiff that his options were accurately recorded, and Plaintiff was injured as a result.

### D.  MITIGATION OF DAMAGES

Defendants next argue that even if Kodak and/or Computershare are liable to Plaintiff for damages arising out of his July 30 exercise, such liability gives rise to a duty to Plaintiff to mitigate his damages (*see* NYSCEF 165 ¶¶ 78-101). In the context of damage stemming from breach of contract, it is Defendants' "burden of establishing not only that plaintiff failed to make diligent efforts to mitigate, but also the extent to which such efforts would have diminished its damages" (*LaSalle Bank Nat. Ass'n v Nomura Asset Capital Corp.*, 72 AD3d 409, 411 [1st Dept 2010] [internal citations omitted]). While under the comparative negligence statute, CPLR 1411 states "the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the [plaintiff] bears to the culpable conduct which caused the

damages." Similarly, comparative negligence is "an affirmative defense to be pleaded and proved by the party asserting the defense" (CPLR 1412).

In support of their position, Defendants make much of Plaintiff's failure to ascertain for himself the exact number of vested NSQOs he had around the time of exercising his options on July 30, 2020 (*see* NYSCEF 165 ¶¶ 86-88). The evidence reveals, however, that Plaintiff questioned Computershare's representative on the phone call regarding the accuracy of the number of shares in his account and was repeatedly assured the number was correct (*see* DX A).

Defendants also almost exclusively rely on Karen Kelly's trial testimony to argue that had Plaintiff called her after his phone call that day, she would have immediately addressed and corrected the issue, and he would have been able to exercise all of his 125,695 NSQOs (*id.* ¶ 95). However, Kelly merely stated that she would have "[a]nalyze[d] the account, determine what happened, and ask[ed] Computershare to correct the error" the "[s]ame day" and that she would have "fixed it immediately" without providing any further evidence as to how this could have been accomplished (Tr. 254:9-12; 275:7-8). Defendants' reliance on two sentences from Kelly's testimony is insufficient to carry their burden to establish that had Plaintiff contacted Kelly on July 30, 2020, it would have mitigated his damages, let alone the extent to which Plaintiff contacting Kelly would have in fact diminished his damages (*see LaSalle Bank*, 72 AD3d at 411).

Defendants' reference to the issue Dolores encountered when attempting to exercise her options is similarly insufficient to establish a mitigation or comparative negligence defense. Dolores mistakenly elected a cash exercise instead of the more efficient cashless exercise permitted under the Omnibus Plan and ultimately had Kelly fix the issue for her (Tr. 217:10-19; DX B 30:24-32:9). That Plaintiff was aware of this does not change the outcome (DX B at 32:5-

9). Dolores' issue was nothing like that experienced by Plaintiff and does nothing to establish that had Plaintiff contacted Karen Kelly, she would have been able to investigate Plaintiff's account, determine how many NSQOs should have been in his account, reinstate those options into his account, and then direct Computershare to perform the transaction, all within 24 hours. In any event, the record established that Kodak explicitly instructed Plaintiff to communicate *with Computershare* (not Kodak) regarding the exercise of his options.

Based on the foregoing, Defendants have failed to establish the defense of mitigation or comparative negligence

### E. DAMAGES

Under New York law, "damages for breach of contract should put the plaintiff in the same economic position [they] would have occupied had the breaching party performed the contract" (*Empery Asset Master, Ltd. v AIT Therapeutics, Inc.*, 215 AD3d 10, 16 [1st Dept 2023] [internal quotation omitted]). While in some instances the proper valuation of publicly traded stock is determined by "calculating the midpoint between the high and low trading price for defendant's common stock on [the date of the breach]" (*id.*), here the evidence at trial established that the market price of Kodak stock at the time of Plaintiff's attempted exercise on July 30, 2020 was $31.49, which was the price at which Kodak actually exercised Plaintiff's expired 21,978 Agreement Four options (PX 13; see also NYSCEF 156 ¶ 15). Therefore, Plaintiff's damages are measured by the actual stock price prevailing at the time of the breach and which, the evidence showed, would have been used to exercise his outstanding options but for the breach of contract.

Based on the evidence presented, the total pre-tax proceeds Plaintiff should have received upon exercise of his exercisable options was $1,651,940.70, measured by multiplying the

number of vested options awarded in each of the first three Award Agreements by the difference between the market price (*i.e.*, $31.49) and each award's corresponding strike price (*see* NYSCEF 165 at 24-25). However, there must be a setoff to account for the $386,593.02 in pre-tax proceeds Plaintiff actually received from the mistaken exercise of 21,978 *expired* options from the fourth Award Agreement (PX-15).[3] Accordingly, the amount that would put Plaintiff in the same position he would have been in but for the breach is $1,293,916.88.

## CONCLUSION

Accordingly, it is

**ORDERED and ADJUDGED** that Plaintiff Brad Kruchten is entitled to judgment, jointly and severally, against Defendants Eastman Kodak Company (First Cause of Action - Breach of Contract) and against Computershare, Inc. and Computershare Trust Company, N.A.

---

[3] In his post-trial papers, Plaintiff for the first time argues that Defendants are not entitled to a setoff of the net proceeds Plaintiff received from the mistaken exercise of 21,978 NSQOs on July 30, 2020 and rejects this argument (NYSCEF 167 ¶¶ 34-43). Previously, Plaintiff credited the setoff in his damages calculation as alleged in his Complaint, though it appears he used the post-tax proceeds amount rather than the pre-tax proceeds amount to do the calculation (*see* NYSCEF 2 ¶¶ 43-44). Moreover, Plaintiff stipulated to the fact that none of his options in the Fourth Award Agreement had vested, acknowledging that none of the 21,978 options were able to be exercised (NYSCEF 156 ¶ 7). Plaintiff's belated argument to avoid a setoff, which would result in a windfall beyond the amount to which he would have been entitled if Defendants had accurately exercised his options, is unavailing.

(Fourth Cause of Action - Negligence) in the total amount of $1,293,916.88, with prejudgment interest at the 9% statutory rate from July 30, 2020, to be calculated by the Clerk; and it is further

**ORDERED and ADJUDGED** that Plaintiff's Second, Third, and Fifth Causes of Action are **dismissed**; and it is further

**ORDERED** that the Clerk enter judgment accordingly, with taxable costs (not including attorney's fees), upon submission by Plaintiff of an appropriate bill of costs and proposed judgment in proper form.

20231229122903JMCOHEN943A619B85AF43ABB17BA4011EFB8D07

_____

DATE: **12/29/2023**                         **JOEL M. COHEN, JSC**

**Check One:**       [ X ] **Case Disposed**            [ ] **Non-Final Disposition**

**Check if Appropriate:**   [ ] **Other (Specify** _____ **)**

[* 30]